## MERRIAM V. CHILDS, *Appellant.*

**The finding** of the trial court against the equitable offsets, set up in answer to a suit on notes executed by defendant to plaintiff, reviewed and not disturbed.

*Appeal from Jackson Circuit Court.*—HON. T. A. GILL, Judge.

AFFIRMED.

*Gage, Ladd & Small, W. V. Childs,* and *Chase & Powell* for appellant.

(1) The great preponderance of the evidence in the case shows that the respondent refused to return the appellant's securities of the value of ninety thousand dollars, when lawfully demanded, which securities were a pledge for the same debt herein sued for, to-wit, appellant's note for $3,770.42, of which the note sued on for $5,305.37 is only a renewal. (2) The claims of appellant are matters of equitable setoff. Both the stock and the title to two-fifths of the same were held by respondent in trust for appellant. Although he might have been sued at law for the conversion of the stock, he is also responsible in equity for it. Under the circumstances, it is a proper case for accounting, so far as the stock is concerned. The mere agreement to offset mutual claims gives a court of equity jurisdiction. Story's Eq. Jur., sec. 1435. The equitable nature of appellant's claims, the agreement of respondent to offset, the non-residence of respondent, the fact that the appellant's demand except for the agreement may be and is now barred by the statute of limitations, while respondent's claim is not barred, are all sufficient grounds for afford-

ing the appellant relief in this action. *Reppy v. Reppy*, 46 Mo. 571 ; *Fulkerson v. Davenport*, 70 Mo. 541 ; *Barnes v. McMullins*, 78 Mo. 272, and cas. cit. (3) The respondent has not pleaded the statute of limitations to appellant's claim, and the court cannot now set it up for him.

*William J. Scott* for respondent.

The evidence fully sustains the finding of the trial court, and its judgment should be affirmed.

BLACK, J.—On December 14, 1876, the defendant gave plaintiff a note for $3,770.42, due at one day, for borrowed money, and secured the same by thirty thousand shares of stock in the Rough and Ready Gold and Silver Mining Company ; and on the twentieth of February, 1877, he gave the plaintiff another note for eight hundred and thirty dollars. On the first of August, 1880, the defendant renewed these notes by executing to plaintiff one for $5,305.37, and the other for $1,170.57, both payable at one day. The renewal notes constitute the basis of this action ; they are payable in gold coin, and bear interest at the rate of one per cent. per month. These notes were all made at San Francisco, California.

The answer sets up equitable offsets. At least it has been so treated by the parties, and we will so treat it here. The allegations as to the offset here in question, are, in substance, as follows : That, on the first of January, 1877, defendant sold the thirty thousand shares of stock to Mr. Hale, of New Hampshire, then in California, at three dollars per share, ninety thousand dollars ; that, to get the stock to deliver to Hale, he tendered plaintiff the amount due upon the $3,770.42 note and demanded the stock ; that plaintiff refused to deliver up the stock, promising to do better for the stock than Hale had proposed, and thus defeated the

sale; that, within a month, the stock market broke, and this stock became worthless; that, subsequently, the plaintiff acquired the mining property; that plaintiff admitted his liability to defendant when the renewal notes were made, and they were given simply as a memorandum of the amount to be deducted from the plaintiff's liability to defendant, which was to be settled when the mining property should be sold. The reply does not set up the statute of limitations, but is simply a general denial.

In 1855-6-7, the plaintiff and defendant resided in San Francisco, and became acquainted in transactions connected with the sale of school furniture. Defendant became the owner of over thirty thousand of the fifty thousand shares of stock of the mining company, which owned an undeveloped mine. He was president of the company. That he sold the thirty thousand shares of stock to Hale on the first of January, 1877, at three dollars per share, is established by his evidence and that of Mr. Hale. Defendant testifies that he procured a temporary loan, and tendered the amount then due on the $3,770.42 note to the plaintiff and demanded the stock; that plaintiff refused to deliver it up, saying that "Hale had cheated him and should not have it," and that "he would do better by defendant than Hale had offered." The tender is not proved by any other witness. Plaintiff, in his deposition, which was taken before the defendant testified, says no money was tendered him; that Childs told him of a proposition made by Hale, to buy or trade for the stock, and that upon Childs' representations of the value of the mine, and the trade offered by Hale, he advised Childs not to make it; that he did not know that a price had been offered and accepted. His evidence is a denial of any promise to take the stock, or to account for any loss occasioned by the failure to consummate the sale to Hale;

so that it becomes important to look to the subsequent transactions of the parties.

At the date of the first of the two notes before mentioned, December 14, 1876, the mining company, to erect a mill without making an assessment upon the stock, borrowed of the plaintiff sixty-five hundred dollars, and secured the same by a mortgage on all of the mining property. When the stock became worthless, in February, 1877, the contractor for the erection of the' mill abandoned his contract. Mechanics' liens were prosecuted against the mining property, and the plaintiff bought it all in under these judgments, at least, one of them. On the twenty-sixth of February, 1877, the directors of the company allowed an account in favor of Childs for $3,410.17, and on the motion of Childs, a note was made therefor, payable to Merriam. Childs says that this was done because Merriam asked for the demand, and at the same time said : "I am going to take your interest, and when I get my money out of the property, I will pay you. We will settle when we settle our accounts." We do not see that Merriam ever set up this demand as a debt against the company. It does not appear to be mentioned in the after transactions of the parties.

In April, 1877, the mining corporation made a deed of all of its property to Merriam, in payment of the demands held by him against the company and the stockholders thereof. It appears that, in November, 1879, Childs, in company with Mr. Richmond, went to Boston, Massachusetts, where the plaintiff then resided. He says Merriam came to see him, at the Parker House, where they had the following conversation in the presence of Mr. Richmond : "Merriam said, 'Childs, when are we going to settle?' I remarked, 'I don't owe you any.- thing.' He said, 'you are in my debt.' I said, 'how is that! You prevented me from selling that stock to Hale, did you not? You owe me money.' He

said, 'yes, I do, but I will see that you don't lose any money.' "

Richmond, in his deposition, taken in 1884, corroborates this evidence as to the conversation, except he says he met Merriam for the first time at the Parker House, whereas Childs says Richmond knew Merriam before, having seen him in San Francisco. The plaintiff does not appear to have been examined or cross-examined as to this alleged conversation. Both parties agree that they transacted some business at the office of Mr. Hazeltine, plaintiff's attorney, in Boston, about the same date. Merriam then held another note against the defendant, for sixteen hundred and fifty dollars, made at San Francisco on September 1, 1878, for money loaned defendant in connection with the school furniture business. Childs says he then wanted this note settled, but that Merriam did not have the note; that Merriam figured up the payments, and said that there was due on the note $1,159.33. Merriam gave Childs a receipt, which shows that the above amount was to be indorsed upon a note held by Merriam. Childs says this receipt was designed to show a liquidation of the note and a like credit to Merriam on the mining matters. We are satisfied the receipt was given because of moneys which Merriam had collected on school orders, held by him as security for the payment of the sixteen hundred and fifty dollar note, and that it has and had nothing whatever to do with the mining matters.

At this meeting in Boston, Merriam agreed to give Childs a two-fifths interest in the mine. Just before this Childs and a son-in-law of Merriam had re-located the mine, but they released their interest to Merriam. Subsequently, and on the seventh of April, 1880, at San Francisco, Merriam bonded, as it is called, the mine to Childs, the object of which seems to have been to enable the latter to sell the same. On the same day Merriam gave him another agreement, by which Childs was to

have two-fifths of the proceeds of the sale, and, if sold by Merriam after the expiration of the bond, Childs was still to have two-fifths of the proceeds, deducting therefrom the latter's indebtedness to Merriam. The agreement contains the provision, " it is distinctly understood that this agreement shall in no case bar me from otherwise collecting said Childs' indebtedness to me at any time, provided the sale of this property under said bond is not perfected."

Childs did not sell the property, but Merriam did, for five thousand dollars, and the former has received credit on the notes in suit for the two-fifths. Finally, defendant says that, in August, 1880, Merriam wanted renewal notes, because the old ones were about to be barred by the statute of limitations of California ; that he objected to giving them, because Merriam would be getting one per cent. per month, when he would only be getting seven or eight per cent. on his demand, but Merriam said: " You have no business to kick on the notes ; you have got enough coming to you ;" that on this statement he made the renewal notes.

From all the evidence, most of which has been detailed at the expense of brevity, we can but conclude that the defendant has failed to sustain the claim made in the answer. His conduct and actions are at war with the existence of any such a demand. If he had any such a demand, it accrued when it is claimed Merriam refused to give up the stock. It was a claim for ninety thousand dollars. Within thirty days the stock became worthless. The whole mining property was not, thereafter, worth the liens upon it. The defendant was at all times in need of money, and yet he dallied along with this claim for years, and did not assert it by any action until sued on these notes. This conduct and delay is not satisfactorily answered by this record. What was said at the Parker House, in the presence of Mr. Rich-

mond, is the strongest of the defendant's evidence. Mr. Richmond did not hear all of the conversation. Much had been said before he came into the room, and he states that he had not before seen Merriam. We are satisfied this reported conversation should be taken with many grains of allowance. The effort to give to the receipt, made at Mr. Hazeltine's office on the next day, a turn which the evidence does not warrant, is calculated to throw discredit on what is said to have transpired on the previous day. Within six or seven months from these transactions at Boston the defendant's liability on the notes is recognized in the agreement given to him at the date of the bond, and not a particle of written evidence was demanded of the plaintiff's liability for ninety thousand dollars, or for any claim, on account of the failure to complete the sale of stock to Hale. Indeed, this agreement recognizes the right of plaintiff to collect the notes at any time, and yet the defendant gives us to understand that all these matters were to be settled when the mine should be sold. Again, when the new notes were given, so as to preserve the plaintiff's old notes from the bar of the statute of limitations, the defendant must have known that his demand would also be barred, and yet he renewed the evidences of his indebtedness without corresponding evidence of his demand against the plaintiff.

There had been some litigation between Hale and Merriam before the sale of the mining stock to Hale, and Merriam's feelings toward Hale were of an unfriendly character, and it is said this furnished a motive for defeating that sale. On the other hand, plaintiff had never owned any stock in this company, and we infer, from the evidence, that he did not want any of it. He evidently knew the effect of a refusal to deliver up the stock on a tender of the amount due him. The defendant says this stock had been selling on the stock board at prices ranging from

three to five dollars per share, and it is not unreasonable to believe that he put a high estimate on its value. Plaintiff advised against the consummation of the sale to Hale, but that alone did not make him liable for damages for conversion of the stock. Again, the defendant, in his letter, written to the plaintiff after this suit was commenced, contends for a credit of two-fifths of the mine. It seems he did not then know that it had been sold. He complains that plaintiff refused to let him sell the stock to Hale, but he does not indicate that he had a demand against plaintiff because of the failure to consummate that sale.

We see no reason for interfering with the finding of the circuit court, and the judgment is affirmed. All concur.